NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0483n.06
Filed: July 11, 2006

No. 05-6162

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| BRIAN CARR, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |
| _____ | ) | |

BEFORE: GILMAN and GRIFFIN, Circuit Judges, and DUGGAN, District Judge.[*]

PER CURIAM.

The United States of America ("government") appeals the district court's grant of defendant Brian Carr's motion to suppress evidence. Specifically, the government contends that the district court improperly granted defendant's motion to suppress certain incriminating evidence procured during an lawful search and seizure by law enforcement officers because the law enforcement officers had consent granted to them by a third-party guest. Conversely, defendant contends that the search was effectuated without the requisite consent.

For the reasons set forth below, we affirm.

_____

[*]The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

I.

On January 14, 2005, Chief Deputy Sheriff Wayland Cothron and Michael Thompson, the Director of the 15th District Drug and Violent Crime Task Force ("Task Force"), responded to a dispatcher's call concerning a motorist requesting assistance at a grocery store parking lot in Hartsville, Tennessee. When the officers arrived at the parking lot, they found Clinton Wix standing near a gray Chevrolet pickup truck motioning for the officers to stop. Wix advised Cothron that he had locked his keys in the truck. Upon Cothron's request, Wix completed a release of liability form authorizing Cothron to unlock the truck.

Cothron noticed that there were no keys in the ignition of the truck, and the truck was parked near the front of the parking lot rather than near the store's entrance. Although Wix said that he was at the store to buy diapers, Cothron was suspicious of the story and felt the hood of the car, finding it cool to the touch. In response to Cothron's continued questioning, Wix affirmed that it was his truck. Although Thompson observed that the licence plates were from Trousdale County, a small county, he did not recognize Wix as a resident of that county. Thompson pressed Wix for more information, and he then stated that it was his brother's truck. Thompson asked who his brother was, and Wix responded that it was the defendant. Thompson knew that Wix was not defendant's brother.

Wix then stated that defendant, Brian Carr, had granted him permission to come and get the truck. The officers became concerned that Wix was trying to steal the truck and requested identification. Wix asked them to forget about helping him. Wix then admitted lying to the officers

about driving the truck to the parking lot and locking the keys in it.  In response to the officers' questioning, Wix insisted that he was not trying to steal the truck and urged the officers to verify this information with Scotty Mungle, who Wix said lived with defendant.  Wix then directed them to a blue Chevrolet car parked nearby.

The officers approached the car and spoke with Mungle.  Mungle told the officers that he, Wix, and a woman named Brandi Miller drove to town to purchase some diapers, and that he needed to get "some stuff" out of defendant's truck.  Mungle advised the officers that he was working on a building at defendant's home and that he lived with defendant.  Mungle also stated that he had defendant's permission to access the truck and was not trying to steal it, but had locked his keys in defendant's truck and was trying to get them out in order to get into a shed at defendant's home.

Wix was arrested for filing a false police report.  Miller, the driver of the blue car, was arrested, subsequent to a police check, for an outstanding warrant and for possession of a small amount of methamphetamine and Xanax in her purse.  At some point during these interactions, additional officers arrived to take Wix and Miller into custody.  Thompson and Cothron continued to question Mungle about whether he had permission to access defendant's truck and noted that he appeared under the influence.  At the suppression hearing, Thompson testified that he suspected Mungle was on probation when he first saw him.  Cothron testified that they did not have a basis to charge Mungle with anything at the parking lot, but nevertheless continued to investigate him for possible attempted vehicular theft or burglary.  The officers did not specifically tell Mungle that he was free to leave, and, with the departure of Wix and Miller, Mungle lacked transportation.

After the officers informed him that he was under investigation for attempted vehicular theft, Mungle advised the officers that he possessed a key to defendant's home.[1]  Thompson asked Mungle if he had belongings at defendant's home, and Mungle replied that he did.  Thompson then requested that Mungle accompany them to defendant's home to show them that he had a key to defendant's home, which Mungle agreed to do.  Thompson made this request knowing that defendant was at work.  Mungle testified, by way of affidavit, that he did not feel he had a choice but to comply because Thompson advised him that he would "have to show him proof that [he] had a right to be in the home or [he] was going to be arrested for auto theft[.]"

For safety reasons, the officers patted Mungle down on two occasions prior to driving to defendant's home.  During the course of one of the pat-downs, Thompson found a small methamphetamine spoon on Mungle.  Sometime after Thompson discovered the spoon, the officers transported Mungle to defendant's home.  As Mungle directed the officers to defendant's home, the officers discussed various subjects with Mungle, including his status as a probationer.  When they arrived at defendant's house, Mungle opened the basement door with a key and entered the basement.  The officers followed him inside.  After entering the basement, Thompson recognized

---

[1]The Task Force had previously searched defendant's home. On April 15, 2004, Task Force officers went to defendant's home and requested permission to search his home for evidence of the manufacture of methamphetamine and for the presence of another man for whom there were outstanding arrest warrants.  Defendant consented to the search, and the officers subsequently observed several firearms and suspected methamphetamine containers in defendant's house.  On May 10, 2004, officers returned to defendant's home with a search warrant authorizing the seizure of the firearms.  The fruits of these searches, and the January 14, 2005 search, formed the basis for the indictments against defendant.

the smell of methamphetamine. Mungle pointed to some clothing on the washing machine that he said belonged to him. The officers did not verify this claim, but, instead, asked Mungle to show them where he slept. Mungle stated that he slept on the couch in the upstairs living room. Thompson, in turn, requested that Mungle show them the couch. As they walked through the house en route to the couch, Thompson observed a white powder residue on the kitchen table, a turkey baster, a Pyrex dish, a pill crusher, a fan, and a drying instrument, all of which he recognized as equipment often used in the manufacture of methamphetamine.

Only after being in the basement and walking through the upstairs in order to view the couch, did Thompson advise Mungle that he was satisfied that Mungle had authority to access the home and was not trying to steal the defendant's truck. Thompson further informed Mungle that he had observed evidence of methamphetamine manufacturing and asked Mungle for permission to search the home. Mungle refused to consent. Thompson advised Mungle that he was on probation and that it was a violation of the conditions to refuse to permit a search of his residence, but Mungle refused any further search because the house did not belong to him. The officers then attempted to contact defendant on the phone at his place of work.

Thompson placed Mungle under arrest and advised him of his *Miranda* rights in order to secure the premises while the officers procured a search warrant for the residence. Thompson directed another officer to have a canine search defendant's truck at the grocery store parking lot, without a warrant, based on the methamphetamine-related evidence found at the house. Thompson also made a protective sweep of the house, and, upon Mungle's direction, fetched him a glass of

water.   During the course of both activities, Thompson observed additional evidence of methamphetamine manufacture.

A thorough search of the home followed the procurement of a warrant.  An officer took a statement from Mungle, recounting the day's events, and noted that Mungle appeared of normal intelligence and alert at the time of the statement, but was "excited and very, very nervous."  When defendant returned to Hartsville from work, he was arrested and transported to his home where the search was being executed.

On February 22, 2005, defendant was indicted for one count of possessing an unregistered machine gun in violation of 26 U.S.C. § 5841, one count of possessing thirty-six other firearms as an unlawful user of controlled substances in violation of 18 U.S.C. § 924(a)(2), one count of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 846, one count of manufacturing methamphetamine in violation of 21 U.S.C. § 841(a)(1), one count of possessing the equipment to manufacture methamphetamine in violation of 21 U.S.C. § 843(a)(6) and (d)(2), and one count of possessing hydrocodone in violation of 21 U.S.C. § 841(a)(1).

On May 23, 2005, defendant filed a motion to suppress the evidence seized on January 14, 2005.  The district court held evidentiary hearings on June 9, 2005, and June 17, 2005, after which it granted defendant's motion to suppress.  The district court found that the third-party consent of Scotty Mungle for police officers to enter the home of defendant was involuntary.  Further, the district court found that Mungle had not consented to the search.  As a result, the district court suppressed evidence resulting from the January 14, 2005, search of defendant's truck and home, as

well as defendant's statements at the time of his arrest pursuant to the fruit of the poisonous tree doctrine.

This timely appeal followed.

II.

Reviewing the denial, or the grant, of a motion to suppress is a mixed question of fact and law. *United States v. Hurst*, 228 F.3d 751, 756 n.1 (6th Cir. 2000). This court reviews the district court's findings of fact for clear error and the district court's conclusions of law de novo. *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006). A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, "is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). The reviewed evidence must be viewed "in the light most likely to support the district court's decision." *Dillard*, 438 F.3d at 680 (internal quotation marks and citations omitted). Finally, "'where there are two permissible views of the evidence' the district court's conclusions 'cannot be clearly erroneous.'" *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

The Fourth Amendment prohibits searches without a warrant or probable cause with few exceptions, one of which is valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The consent to search must be "freely and voluntarily given." *Id.* at 222 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). Valid consent may be given by parties other than the

defendant, including "'a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

It is uncontested that "it is the government's burden, by a preponderance of the evidence, to show through 'clear and positive testimony'" that Mungle's valid and voluntary consent to the search was obtained. *Worley*, 193 F.3d at 385 (internal citations and quotation marks omitted). This court has repeatedly noted "that not any type of consent will suffice, but instead, only consent that is 'unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion.'" *Id.* at 386 (quoting *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir.1992)); *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978) (holding that the government bears the burden of proving "by clear and positive testimony" that consent was voluntary, unequivocal, specific, and intelligent).

The government argues that Mungle voluntarily consented to the presence of the officers in Carr's home, and, thus, the district court clearly erred by granting defendant's motion to suppress. Conversely, defendant responds that the district court correctly determined that Mungle did not voluntarily consent to the search. Defendant urges us to affirm.

Whether Mungle consented to the officers' search of defendant's home entails a fact-specific inquiry. *United States v. Carter*, 378 F.3d 584, 588 (6th Cir. 2004) ("[E]ach such determination is fact-specific, and there is no magic formula or equation for determining consent in the abstract.") (internal quotation marks and citation omitted). So long as the consent satisfies the foregoing

factors, it may be granted by verbal or non-verbal communication. *Id.* (holding that where "officers specifically asked if they could come in," and defendant "was not threatened, coerced, or tricked," opening the door in response and standing aside to allow officers' entry was nonverbal consent). Nevertheless, "[e]ven a spoken assent to search may be too ambiguous to establish consent in certain circumstances." *Id.* (citing *Worley*, 193 F.3d at 386 (6th Cir. 1999) (holding that "you've got the badge, I guess you can [search]" is not consent where context was intimidating and defendant testified that he felt he had no choice)).

"In determining whether a defendant's will was overborne in a particular case, the [Supreme] Court has assessed the totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226 (footnote omitted). This court has also considered "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). Additionally, a court "should consider the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police, and indications of 'more subtle forms of coercion that might flaw [the consenter's] judgment.'" *Id.* (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)) (citation omitted). No single factor is dispositive of the analysis. *Schneckloth*, 412 U.S. at 226.

Here, the government contends that the totality of the facts and circumstances do not establish that Mungle's consent was involuntary, noting that: custody, or the threat of custody does

not automatically invalidate the voluntariness of consent; Mungle's fear of arrest did not invalidate his consent; the later refusal to consent demonstrated that Mungle was not "overborne" by the officers; the length of time that Mungle was detained was not coercive in its duration; although Mungle was patted down twice, he was not in handcuffs, and rode in the front seat of the police vehicle; and, although Cothron suspected that Mungle was under the influence, Mungle was able to understand the events that transpired.

In assessing the totality of the testimony and circumstances, the district court specifically found, with respect to Mungle's consent, that: (1) both Mungle and Thompson knew that Mungle was a probationer from Thompson's agency, a fact contributing to subtle coercion; (2) the police had arrested Mungle's two companions, leaving Mungle isolated; (3) both Mungle and Wix were under the influence; (4) the police performed two pat-downs of Mungle in the course of the "investigation" prior to entering Carr's home; (5) during the course of the pat-down, Thompson, the head of the agency of which Mungle was on probation from, found a small methamphetamine spoon, and then requested that Mungle cooperate and take him to the home of a known criminal suspect; and (6) when Mungle was positively asked for his consent, he refused. Based on these facts and circumstances, the district court concluded that Mungle's alleged consent was not voluntary, unequivocal, specific, and intelligent.

Because the issue of consent is a factual determination that we review with a high degree of deference, we affirm. *Carter*, 378 F.3d at 589 (6th Cir. 2004) ("[P]recisely because testimony often becomes more ambiguous when reduced to toneless words on a page, we defer to the district court's

factual finding."); *Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").  The district court's view of the evidence was permissible, and, therefore, it is not clearly erroneous.

## III.

For these reasons, we affirm the order of the district court.