RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0296p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

          *v.*                                    No. 09-3289

MCCELLON MONTGOMERY,
                    *Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 08-00124-001—Gregory L. Frost, District Judge.

Decided and Filed: September 13, 2010

Before: SUTTON and McKEAGUE, Circuit Judges; JONKER, District Judge.[*]

———————————

## COUNSEL

**ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Robyn Jones Hahnert, Kevin W. Kelley, ASSISTANT UNITED STATES ATTORNEYS, Columbus, Ohio, for Appellee.

———————————

## OPINION

———————————

SUTTON, Circuit Judge. McCellon Montgomery challenges the district court's denial of his motion to suppress evidence, claiming he did not voluntarily consent to a search of his home due to the effects of medication. Because medication (or for that matter intoxication) is one among many factors to consider in the inquiry, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), and because the sum of relevant

———————————

[*]The Honorable Robert J. Jonker, United States District Judge for the Western District of Michigan, sitting by designation.

circumstances supported the district court's credibility-based decision that Montgomery voluntarily consented, we affirm.

I.

In the early morning of July 14, 2007, while Montgomery stood on the back porch of his home near Lucasville, Ohio, someone hiding in the trees shot Montgomery in the back with birdshot or buckshot. Montgomery woke up his girlfriend, Joyce Ewing, who was passed out on the couch after a night of beer drinking and marijuana smoking. Ewing retrieved Montgomery's .22 rifle and Montgomery returned fire, after which Ewing called 911. The assailant fled.

Officer Daniel Malone arrived and found Montgomery standing shirtless in front of the house, his back peppered with pellet holes. After confirmation that the shooter was gone, Malone and Montgomery waited for medical personnel to arrive. Malone noticed that Montgomery had no trouble communicating, as did Officer Anthony Crawford, who arrived shortly after Malone.

After Montgomery left for the hospital, Detective Paul Blaine arrived, and the two officers and he surmised that the attacker had tried to break into the shed. Blaine relayed the developments to his supervisor, Captain John Murphy, who was at the hospital with Montgomery, and asked Murphy to ask Montgomery for consent to search the home and outbuildings.

The officers had other reasons to search the area. They noticed marijuana paraphernalia in the kitchen, a humming noise coming from the shed, a pressurized garden hose leading into the shed and the smell of marijuana near the shed, leading them to think that the shed housed a marijuana-growing operation.

When Montgomery arrived at the hospital, Nurse Jason Bennett took care of him. Bennett recorded no active bleeding from Montgomery's wounds, and noted that the "patient is alert and oriented . . . to person, place, and time, [has] clear speech, [and] answer[s] any questions appropriately," R.47 at 141.

Ten minutes after arriving at the hospital, Montgomery complained of pain rating a 10 on a 10-point scale, prompting another nurse to administer 8 mg of morphine intravenously. Five minutes after the injection, Bennett noted that Montgomery was still alert and not disoriented. In the meantime, the doctor ordered a catheter to help drain Montgomery's bladder, but he refused. Bennett deferred to Montgomery's wishes because he saw no reason to question Montgomery's ability to make the decision for himself. About ten minutes later, Montgomery rated his pain a 4 out of 10.

Around this time, roughly twenty minutes after Montgomery had arrived at the hospital, Captain Murphy and Detective Denver Triggs asked Montgomery for consent to search his home and outbuildings to help them locate the shooter. Montgomery responded, "That's fine," without question or hesitation. R.47 at 313. The officers did not tell him that he could refuse to consent and they did not obtain the consent in writing. According to Bennett, the officers did not interfere with Montgomery's medical care during the questioning, Montgomery remained alert throughout and the morphine did not affect Montgomery's ability to answer the officers' questions.

Captain Murphy called Detective Blaine and told him that Montgomery had consented to the search. At the house, Ewing signed a consent form, after which the officers began the search. The police discovered a marijuana-growing operation inside the shed and in a cellar beneath the home.

A federal grand jury indicted Montgomery for knowingly growing "100 or more marijuana plants." R.3; *see* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii). Montgomery moved to suppress the evidence obtained from the search, contending that he was incapable of voluntarily consenting to the search and that Ewing lacked the authority or the capacity to consent. The district court held a suppression hearing in which eleven witnesses, including Nurse Bennett, testified. After the hearing, the court denied the motion on the ground that Montgomery had given his consent voluntarily and did not reach the issue of Ewing's consent. Montgomery pled guilty, reserving the right to appeal the suppression ruling.

II.

Montgomery claims that, in the aftermath of the shooting and the medication, "the objective evidence shows that he could not physically or mentally have acquiesced, in any meaningful fashion, to the officer's request for consent to search." Montgomery's Br. at 10.  The general grounds for this type of claim are well-plowed.  Police officers do not need a warrant to search a home when the owner consents to the search. *Schneckloth*, 412 U.S. at 219.  Any consent must be "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *see also United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008).  Voluntariness is a question of fact determined under the "totality of all the circumstances," which includes these considerations, among others:  "youth of the accused; his lack of education, or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep." *Schneckloth*, 412 U.S. at 226–27 (citations omitted).  In reviewing consent determinations, we defer to the district court's findings and credibility determinations while construing the evidence in the light most favorable to the winner of the suppression motion—the government in this instance. *See Moon*, 513 F.3d at 536–37.

We sympathize with one legal premise of Montgomery's argument but not another.  It is no doubt the case that medication or intoxication may diminish the capacity to consent to the extent it undermines an individual's grasp on the reality of what he is doing.  When officers seek and obtain consent from a medicated or intoxicated individual, as is sometimes appropriate, they can expect a dispute about the voluntariness of any consent given and what often comes with it:  attendance and testimony at a suppression hearing.  And in some settings, the influence of drugs, prescribed or otherwise, or the influence of alcohol may tip the balance in favor of finding a lack of capacity to consent to the search.

Yet Montgomery apparently wants more.  He wants what amounts to a per se rule that medication (or intoxication) necessarily defeats an individual's capacity to consent,

given that the only cognizable evidence on which he relies relates to the morphine injection.  That is a bridge too far.  As a general matter, per se rules are anathema to the Fourth Amendment, *see Ohio v. Robinette*, 519 U.S. 33, 39 (1996), a provision that speaks of "unreasonable" searches and seizures, U.S. Const. amend. IV, and a provision whose rights can be waived by consent, as measured by the "totality of all the circumstances," *Schneckloth*, 412 U.S. at 227.  Drug-induced impairment, moreover, is a matter of degree, making it appropriate to gauge the impact of drugs on a case-by-case basis and in view of other circumstances at play.

This approach is consistent with a series of unpublished decisions in our circuit.  In one case, the defendant claimed that the party giving consent was under the influence of crack cocaine.  *See United States v. Griffin*, No. 96-5326, 1997 WL 487325 (6th Cir. Aug. 15, 1997) (per curiam).  We eschewed adopting a bright-line rule, holding that the record did not show sufficient impairment to deem her consent invalid and reasoning that "voluntary consent can be given even by a person under the influence of drugs, when that person is coherent and fails to exhibit any visible impairment." *Id.* at *3.  In another case, the defendant claimed that he was too intoxicated to consent to a search.  *See United States v. Fletcher*, 295 F. App'x 749 (6th Cir. 2008).  We upheld the search on plain error review based on the testimony of two police officers, who said that the defendant "did not seem impaired, was not swaying or unsteady, had no trouble signing the consent form, and appeared to be coherent." *Id.* at 757.  At the same time, we have affirmed at least one case in which the district court found that the individual's drug impairment and several other factors precluded a valid consent to search.  *See United States v. Carr*, 187 F. App'x 602, 607 (6th Cir. 2006) (per curiam).

This approach also lines up with decisions from the other circuits.  *See, e.g.*, *United States v. Watters*, 572 F.3d 479, 483 (8th Cir. 2009) ("Factors relevant to the voluntariness of a defendant's consent include whether the defendant was intoxicated, but intoxication alone does not render consent invalid."); *United States v. Scheets*, 188 F.3d 829, 839–40 (7th Cir. 1999) ("The mere fact that an individual is intoxicated does not render consent involuntary. . . .  It is simply another factor to be taken in

consideration when assessing the totality of the circumstances."); *United States v. Gay*, 774 F.2d 368, 377 (10th Cir. 1985) (holding that defendant "can be too intoxicated to operate a motor vehicle, but rational enough to [consent]").

A related issue arises with *Miranda* waivers. To be valid, waivers of Fifth Amendment rights must be "voluntarily, knowingly and intelligently" made. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Fifth Amendment waiver and Fourth Amendment consent-to-search inquiries, it is true, are not the same. One difference is that the involuntariness prong of a *Miranda* waiver requires "coercive police activity [as] a necessary predicate," *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *United States v. Dunn*, 269 F. App'x 567, 572 (6th Cir. 2008), something generally not required in Fourth Amendment consent cases, *see Schneckloth*, 412 U.S. at 241, 247. Another is that the "knowing and intelligent" prong of the *Miranda* waiver inquiry is *more* protective of individual liberty than the consent-to-search doctrine because it requires a "*full awareness* of both the nature of the right being abandoned and the consequences of the decision to abandon it," namely, a *Miranda* warning, *Moran v. Burbine*, 475 U.S. 412, 421–22 (1986) (emphasis added); *Miranda*, 384 U.S. at 468–69, something not required in Fourth Amendment consent cases, *see Schneckloth*, 412 U.S. at 241, 245–49. Still, cases frequently come up involving *Miranda* waivers by intoxicated defendants, and the inquiries overlap in many respects. As in *Schneckloth*, courts examine the "totality of the circumstances," including the suspect's "age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

Under the "knowing and intelligent" prong of a Fifth Amendment waiver, we have addressed whether drug-impaired suspects could satisfy the test. In *Dunn*, the defendant claimed his waiver was unknowing because he was under the influence of Vicodin and marijuana. 269 F. App'x at 567. Noting credible testimony that the defendant was "alert, coherent, and lucid," we upheld the waiver. *Id.* at 573. In *United States v. Jones*, No. 90-3693, 1991 WL 105751 (6th Cir. June 18, 1991) (per curiam),

we rejected a claim that the defendant did not intelligently waive his *Miranda* rights on the grounds that the "question of [defendant's] incapacitating intoxication, or lack thereof, was simply a credibility issue," observing that the lower court had credited the police officer's testimony that any intoxication did not affect the defendant's "competency or volition." *Id.* at *3.

Other circuits, in likewise upholding *Miranda* waivers, have done so despite drug impairment. *See, e.g.*, *United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008) ("[D]efendant must be impaired to a substantial degree to overcome his ability to knowingly and intelligently waive his privilege against self-incrimination."); *United States v. Cristobal*, 293 F.3d 134, 143 (4th Cir. 2002) ("Medical records indicating that a suspect had been given narcotics, with no supporting evidence as to the effects of those narcotics (on the individual or even in general) are not sufficient to render a waiver of *Miranda* rights unknowing or unintelligent."); *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) ("Intoxication and fatigue do not automatically render a confession involuntary; rather, the test is whether these mental impairments caused the defendant's will to be overborne."). And in a case with facts similar to our own, the Tenth Circuit held that a hospitalized defendant recovering from gunshot wounds and laboring under the influence of a painkiller, but who nonetheless was "alert and responsive" during questioning, knowingly and intelligently waived his rights. *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002).

In the face of these legal parameters, the district court did not clearly err in denying Montgomery's suppression motion. The key problem for Montgomery is the testimony of the nurse who took primary care of Montgomery, all of which the district court credited. Even after administering morphine to Montgomery, Nurse Bennett testified that he remained alert and oriented before, during and after the police questioned him, and that the morphine did not affect Montgomery's ability to answer questions. Bennett, moreover, did not just observe Montgomery's volitional coherence; he acted on it. He found Montgomery sufficiently capable of making medical decisions that he honored Montgomery's refusal of a catheter. Hospital records corroborate

Bennett's testimony.  So does the testimony of the two officers at the hospital, who observed that Montgomery did not seem impaired after he received the pain medication. The district court did not commit clear error in relying on this evidence, particularly in relying on the observations of a medical professional, one trained to understand the effects of medication and one who had relied on Montgomery's coherence in making medical decisions over the same period of time.

Montgomery paints a different picture.  He emphasizes the serious nature of his injuries, his initial 10-on-a-scale-of-10 pain level and the 8 mg morphine injection he received before police questioned him.  But the reality that Montgomery was in pain (a 4 on a scale of 10 at the time of the questioning) and received morphine does not by itself show impairment.  The district court had the benefit of relying on the testimony of a registered nurse, in addition to the police officers, all of whom testified that Montgomery had no trouble understanding and answering questions.  So long as this determination is "plausible in light of the record viewed in its entirety," which it was, it cannot be clearly erroneous.  *United States v. Ables*, 167 F.3d 1021, 1035 (6th Cir. 1999).

Montgomery also points out that the officers never informed him of his right to refuse consent.  But this fact, whether taken alone or in conjunction with the pain and medication, does not dispose of the voluntariness inquiry, as the question must be gauged in light of all of the circumstances, not just some of them.  *Schneckloth*, 412 U.S. at 227.  Montgomery did not present any evidence about his background, such as his education, intelligence or anything else, suggesting that he did not understand his right to refuse consent, and of course all of the people present at the hospital at the time Montgomery gave consent, including at least one with no stake in his answer to the question (the nurse), thought he had his wits about him.

Yet there was other testimony, Montgomery adds.  His girlfriend, Ewing, testified that he was "not himself" and had difficulty answering questions during the ambulance ride, and Ewing's mother testified that Montgomery was "sedated" at the hospital and unable to talk.  Montgomery's Br. at 9–10.  But the district court found their

testimony to be "confusing, illogical, and the result of bias, prejudice or faulty memory related to the use of drugs, alcohol, or both." R.26 at 6. This finding was reasonable in view of the contrary testimony of the other witnesses, which came with far more credibility than the testimony of an interested girlfriend and her mom, and in view of the reality that the district court, unlike us, had a ring-side seat at the proceedings.

III.

For these reasons, we affirm the district court's denial of the motion to suppress.