NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 12a0149n.06

No. 10-5433

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Feb 07, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| DWAYNE WARREN JACKSON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before:  SUHRHEINRICH, GIBBONS, McKEAGUE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.**   Defendant-appellant Dwayne Jackson appeals his conviction for possession with intent to distribute fifty grams or more of crack cocaine.  Jackson entered a conditional guilty plea after the district court denied his motion to suppress evidence seized from the apartment and automobile he shared with his girlfriend, Michelle Ferguson.  Jackson raises three issues on appeal.  First, Jackson contends that the police violated the Fourth Amendment by making a warrantless entry into his apartment without his consent.  Second, Jackson argues that Ferguson's oral consent to the officers' request to search the apartment was involuntary because it was the product of duress and coercion.  Finally, Jackson argues that the police exceeded the scope of Ferguson's consent to search the automobile the couple shared because a reasonable person would have interpreted the exchange

between Ferguson and the police as granting permission only to retrieve Jackson's identification from beneath a visor in the vehicle.

For the reasons that follow, we affirm the judgment of the district court.

## I.

On March 11, 2009, Officer Robert Thomas of the Lexington Police Department's CLEAR Unit[1] received information from his partner, Officer Joe Green, that an individual by the name of Dwayne Jackson was engaged in crack cocaine dealing. The tip came from Jackson's ex-girlfriend, Tamika Crawford, who had approached Officer Green and told him that, in addition to being engaged in narcotics trafficking, Jackson had stolen a television from her house. Crawford told Green that Jackson lived in the Bridle Creek Apartments on Nicholasville Road, but she did not know in which apartment unit he lived. She also told Green that Jackson drove a white Lexus SUV. Green relayed this information to Thomas, who then went with fellow CLEAR Unit officers Michael Sharp and R. B. Schwartz to the Bridle Creek Apartments to investigate. The three officers drove in marked police cruisers and wore their uniforms and duty belts, on which a firearm and a taser were holstered and visible.

Thomas, Sharp, and Schwartz drove through the Bridle Creek Apartments's parking lot to try to locate the Lexus SUV and knocked on some doors to see if they could locate Jackson, but they were unsuccessful. They then began to exit the apartment complex in their vehicles, but as Thomas was pulling out of the complex parking lot, he saw a white Lexus SUV pulling into the parking lot. Thomas made a U-turn on Nicholasville Road and followed the SUV back into

---

[1]The CLEAR Unit is a special task force of the Louisville Police Department that handles many complaints of street-level narcotics trafficking. CLEAR stands for "Community Law Enforcement Action Response."

the lot. Officers Sharp and Schwartz also turned around and drove back into the complex, but it took them several minutes to catch up with Officer Thomas.

After Jackson pulled into a parking space, exited the SUV, and shut the door, Thomas approached him on foot and asked him to confirm his identity. Thomas then asked Jackson if he owned the car, and Jackson replied that he did not own the car, but that the car belonged to his girlfriend, Ferguson. Thomas asked if he could speak with Ferguson. Jackson said that he could and indicated that Ferguson was in their apartment. Thomas asked Jackson if he would take him up to talk to her, and Jackson indicated that he would. Sharp and Schwartz then pulled up behind Thomas and Jackson and exited their patrol cars, at which point Thomas informed them that Jackson was going to take them up to his apartment.

The three officers followed Jackson to his apartment door, which he unlocked with a key. The officers were standing directly behind Jackson when he unlocked the door. Jackson opened the door and went inside, but what happened next is disputed. Thomas testified that Jackson walked in the front door, then looked back at him, at which point Thomas stepped inside. Sharp also testified that "[i]t seemed like [Jackson] held the door, I think, for us" and did not object to the officers' entry into his apartment. Jackson, by contrast, claims that when he put his key in the front door of the apartment, he said, "You all got to hold on a minute because I got to check to see if my girl is decent." However, all three officers testified that Jackson did not say anything indicating that they should not come into the apartment or that they should wait outside while Jackson confirmed that Ferguson was "decent." Jackson testified that he shut the front door of the apartment behind him until it latched and that the officers then opened the door and walked into the apartment behind him without his permission.

3

Ferguson, who had been in bed with the flu that day, heard Jackson come in and say, "Shel, the police are out here, and they want to talk to you," at which point she "jumped" out of bed and walked into the living room, where Jackson and the officers were standing. Ferguson testified that she was "scared, frightened, nervous, shocked" and "very intimidated" by the sight of the officers in her apartment because her prior involvement with the police was limited to receiving a speeding ticket.

When Ferguson entered the living room, Thomas asked her if they could go into the bedroom so they could talk alone. Ferguson agreed, and Thomas and Ferguson went into the bedroom. Thomas then told Ferguson that he had received a complaint about a stolen TV and a narcotics complaint against Jackson. Ferguson testified that Thomas asked her if the officers could "take a look around," and she agreed that they could. Ferguson testified that Thomas never used the word "search" in his request, and she thought that the officers were merely asking to look at things in the apartment that were visible, not to conduct a more invasive search. Thomas testified that he specifically used the word "search" when asking for Ferguson's consent to search and conveyed to Ferguson that the objective of the search was to locate evidence of narcotics trafficking. Thomas also testified that he explicitly asked Ferguson if he could search *both* her apartment and her vehicle for evidence of narcotics trafficking, at which time she was very cooperative and agreed.

Thomas did not threaten to get a search warrant if Ferguson refused to consent to the search, and did not threaten her with arrest. However, Thomas also never informed Ferguson that she had the right to refuse to consent to the search.

Thomas's and Ferguson's testimonies diverge regarding what happened next. Ferguson testified that one of the officers asked Jackson to produce identification, at which point Ferguson

4

volunteered to go get Jackson's driver's license out of the SUV where he kept it under the driver's side vanity mirror. Thomas asked Ferguson if he could go get the license from the SUV instead, and she agreed. Ferguson testified that she did not give Thomas consent to search the SUV.

By contrast, Thomas testified that after he and Ferguson spoke, they exited the bedroom and he told Sharp and Schwartz, in front of Ferguson and Jackson, that Ferguson had given her consent for the officers to search the apartment and her vehicle for illegal narcotics. Ferguson did not say anything to contradict Thomas's statement. Thomas then took the keys to Ferguson's SUV, which were on a counter, and went out and searched the vehicle. In the center console of the front seat, Thomas discovered crack cocaine and marijuana.

Then, according to Thomas, he returned to the apartment, directed the other officers to handcuff Jackson, and informed them that he had found cocaine in the SUV. Sharp and Thomas then conducted a search of the apartment while Schwartz stayed with Jackson.[2] During the search, Sharp discovered marijuana "roaches" on a table in the bedroom, and Thomas discovered a .380 Jennings handgun and a loaded magazine sitting on top of rolled-up men's underwear on a shelf in the bedroom closet. The search also revealed digital scales and packaging material consistent with narcotics trafficking. Thomas described the atmosphere during the search as tense but professional, and Schwartz testified that the atmosphere in the apartment during the

---

[2]Ferguson and Jackson both testified that the search of the apartment occurred before the search of the SUV, not after. The district court credited the officers' version of the events, i.e., that Thomas first went downstairs and searched the SUV, then returned to the apartment, at which point he and Sharp searched the apartment. Before either search occurred, Thomas stated in front of Ferguson and Jackson that Ferguson had consented to a search of the apartment *and* the SUV. This consent was never revoked. Accordingly, which search occurred first is not particularly relevant to the Fourth Amendment inquiry.

5

search was "not hostile." Ferguson's eight year-old son remained asleep in the apartment's second bedroom during the entire search.

Ferguson testified that she did not know she had the right to tell the police officers to leave her apartment after they entered it or to tell them not to search her apartment after she had told them that they could "take a look around." However, Jackson testified that he knew he had a right to tell the police to leave the apartment after they entered, but that he did not do so because he was "shook up" and "scared." Similarly, Jackson testified that he did not attempt to stop the search once it began because he was "shook up" and the officers were "aggressive[ly]" searching. Neither Ferguson nor Jackson verbally objected during the search, and both conceded that they were never threatened by the officers in any way.

Jackson was charged in the United States District Court for the Eastern District of Kentucky with possession with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of crack cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and with two forfeiture counts. Jackson moved to suppress all evidence derived from the March 11, 2009 searches. A suppression hearing was held during which Thomas, Schwartz, Sharp, Jackson and Ferguson each testified. The district court denied Jackson's motion to suppress the evidence seized, concluding first that the three officers followed Jackson through the apartment's front door without objection by Jackson. The court thus credited the officers' testimony over Jackson's claim that he closed the door behind him when he entered the apartment. The court also credited Thomas's testimony that Ferguson gave Thomas consent to search the apartment and the SUV, noting that Ferguson did not object when Thomas told the other officers that she had given them permission to search both the apartment

6

and the SUV. The court concluded that the search had been conducted in a professional manner, as indicated by the fact that Ferguson's son did not wake up during the search. While acknowledging that the presence of officers wearing uniforms and police belts "might well have been intimidating," the district court found it particularly relevant that neither Jackson nor Ferguson objected during the search.

Pursuant to Federal Rule of Criminal Procedure 11(a)(2), Jackson entered a conditional guilty plea to Count 1 of the Indictment, which charged a violation of 21 U.S.C. § 841(a)(1), possession with intent to distribute 50 grams of a mixture containing a detectable amount of crack cocaine, and Count 3, one of the forfeiture counts, preserving his right to appeal the district court's denial of his motion to suppress. Counts 2 and 4 were dismissed pursuant to a written plea agreement.

Jackson was sentenced to 175 months of imprisonment and filed a timely appeal challenging his conviction.

## II.

In reviewing the district court's denial of a motion to suppress, this court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011). "A factual finding is clearly erroneous when, although there is evidence in the record to support the finding," this court "is left with the definite and firm conviction that a mistake has been committed." *United States v. Lucas*, 640 F.3d 168, 173 (6th Cir. 2011). "If there are two permissible views of the evidence, the district court's determination cannot be clearly erroneous." *Id.* The evidence is viewed in the light most favorable to the government. *Beauchamp*, 659 F.3d at 565–66.

## III.

7

The Fourth Amendment bars the government from conducting unreasonable searches and seizures. "[A] search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One of the specifically established exceptions to the warrant and probable cause requirements is a search conducted pursuant to consent. *Id.* However, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "The government bears the burden of proving, through clear and positive testimony[,] that the consent to search was given voluntarily." *Beauchamp*, 659 F.3d at 571 (internal quotation marks omitted).

"Consent is voluntary when it is unequivocal, specific and intelligently given, uncontaminated by any duress or coercion," *id.* (internal quotation marks omitted), and not the product of an "overborne will." *Lucas*, 640 F.3d at 174. A search based on consent requires more than "an expression of futility in resistance to authority or acquiescing in the officers' request." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999); *see also United States v. Canipe*, 569 F.3d 597, 603 (6th Cir. 2009) ("[M]ere acquiescence does not suffice to establish free and voluntary consent.") (internal quotation marks omitted).

## A.

Jackson argues that the police violated the Fourth Amendment when they made a warrantless entry into the apartment he shared with Ferguson without his consent. "[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotation marks omitted).

8

The Fourth Amendment requires that searches of the home be reasonable, *Illinois v. Rodriguez*, 497 U.S. 177, 185–86 (1990), which generally requires that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home. *Payton*, 445 U.S. at 584–86. However, the police may enter a home without a warrant or probable cause if an individual with actual or apparent authority to do so grants the officers consent to enter. *Rodriguez*, 497 U.S. at 186; *see also United States v. Carter*, 378 F.3d 584, 587–88 (6th Cir. 2004) (*en banc*) (Fourth Amendment not violated when officers entered apartment pursuant to motel occupant's consent); *United States v. Campbell*, 317 F.3d 597, 608 (6th Cir. 2003) ("When one person consents to a search of property owned by another, the consent is valid if the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.") (internal quotation marks omitted). "Consent to a search may be in the form of words, gesture, or conduct." *Carter*, 378 F.3d at 587 (internal quotation marks omitted).

We have previously held that a suspect voluntarily consented to the entry into his motel room of several police officers when the officers knocked on his motel room door, initially identified themselves as housekeeping, then identified themselves as officers after the suspect opened the door, asked permission to enter, and entered after the suspect stepped back, letting them in. *Id.* We reasoned that the defendant's act of stepping back from the front door after the police identified themselves and asked permission to enter was conduct sufficient to convey his consent to their entry. *Id.* at 588.

Here, the district court credited the officers' testimony that Jackson led them up to the apartment after they asked to speak with Ferguson, put his key in the door, opened it, went into the apartment, and allowed the officers to follow him inside without objection. The district court

9

did not find Jackson's testimony—that he closed the door behind him until it latched with the officers outside and that the officers then opened the door and entered the apartment without his permission—credible.

The district court's finding that Jackson consented to the officers' entry into the apartment is not clearly erroneous. The officers were standing right behind Jackson when he unlocked the door, and each testified that they did not hear him object to their entry. Jackson's testimony that he said "You all got to hold on a minute because I got to check to see if my girl is decent" is not corroborated by any other witness, and the district court's determination that the officers were more credible than Jackson is entitled to deference. *See United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010). Thomas also testified that Jackson looked back at him as Jackson entered the home, and Sharp testified that "[i]t seemed like [Jackson] held the door" for the officers to enter. Viewing the evidence in the light most favorable to the government, Jackson led the officers to his apartment after Thomas asked to speak with Ferguson, and without saying anything, unlocked the door, entered the apartment, looked back at the officers, and "seemed" to hold the door open to allow them to enter. Such conduct could reasonably be interpreted as consent to their entry. The fact that Jackson did not object when the officers followed him inside further supports the district court's conclusion that he consented to their warrantless entry.

Accordingly, we conclude that the district court's finding that Jackson consented to the officers' entry into the apartment was not clearly erroneous, and the police officers therefore did not violate the Fourth Amendment when they entered the apartment.

**B.**

Jackson next argues that Ferguson's oral consent to search the apartment was the product

of duress and coercion and was therefore involuntary. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. This court considers several factors in determining whether consent was given voluntarily, including the age, intelligence, and education of the individual giving consent; whether the individual understood the right to refuse to consent to search; and whether the individual understood his constitutional rights. *Lucas*, 640 F.3d at 174. This court also considers "the length and nature of the detention, the use of coercive or punishing conduct by the police, and indications of more subtle forms of coercion that might have affected [the] judgment" of the person who consented to search. *Id.* "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Schneckloth*, 412 U.S. at 227.

There is no evidence in the record that Ferguson's consent to the search of her apartment and SUV was the product of duress or coercion. Thomas did not threaten to get a search warrant if Ferguson refused to consent to the search nor did he threaten her with arrest. In fact, Ferguson testified that none of the officers threatened her in any way before, during, or after the searches occurred.

Although Thomas never informed Ferguson that she had the right to refuse to consent to the search, the Supreme Court has explicitly rejected a rule that would require an officer to inform an individual that she has the right to refuse consent in order to render her consent voluntary. *Schneckloth*, 412 U.S. at 231 (rejecting rule that would require officer to advise subject of search of right to refuse consent). Ferguson testified that she did not know she had the right to tell the police officers to leave her apartment after they entered it or refuse to let them

11

search her apartment after she had told them that they could "take a look around." However, Ferguson's lack of knowledge that she could refuse consent—or withdraw it once given—is only one factor to be considered in analyzing whether her consent was voluntary. *Schneckloth*, 412 U.S. at 248–49 ("Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.")

Similarly, though Ferguson and Jackson did not help the officers with the search of the apartment, they also did not object to the search at any point or try to stop the officers from searching. After marijuana was discovered during the search, Sharp issued Ferguson a citation for possession of marijuana and possession of drug paraphernalia, but Ferguson was never arrested or detained, either before or after she consented to the search. The search was not disruptive enough to wake Ferguson's sleeping son, a factor we, like the district court, find relevant. Given that the search was not disruptive enough to wake Ferguson's son, it is unlikely that the police were acting in a manner aggressive enough to coerce Ferguson into consenting to a search, or to convince her that she could not tell them to cease searching. Further, though the officers were attired in uniforms and duty belts, neither Ferguson nor Jackson claimed that the officers touched their handguns or tasers during the encounter in order to intimidate them.

The only testimony that supports Jackson's argument that Ferguson was coerced into consenting is Ferguson's testimony that she did not know she could refuse consent and that she was subjectively fearful and therefore consented to Thomas's request to search because he was being demanding. Ferguson testified that she was "scared, frightened, nervous, shocked" and "very intimidated" by the officers in her apartment. She also testified that she felt Thomas was

12

"very demanding" when he spoke with her alone in the bedroom. Under the totality of the circumstances, we conclude that Ferguson, an adult interacting with police officers in her own home, who by her own admission was not threatened verbally or by any actions of the officers, was not coerced into giving—or under duress at the time she gave—consent to search the apartment. There is simply no evidence that Ferguson's will was overborne by the mere presence of three uniformed officers in her home, one of whom asked for her consent to search.[3] Accordingly, we conclude that Ferguson's consent was voluntarily given.

## C.

Jackson's final argument on appeal is that the police exceeded the scope of Ferguson's consent to search the automobile the couple shared because a reasonable person would have understood the exchange between Ferguson and Thomas as granting Thomas permission only to retrieve Jackson's identification from beneath a visor in the vehicle, not to conduct a full search.

The government contends that Jackson failed to preserve his claim that Ferguson limited the scope of her consent to search the SUV. The government concedes that Jackson's

---

[3]Contrary to Jackson's argument, this case is not analogous to *United States v. Worley*, 193 F.3d 380 (6th Cir. 1999). In *Worley*, this court affirmed the district court's suppression of evidence seized pursuant to an alleged consent search on the ground that defendant's consent to search was involuntary. The *Worley* court held that the district court did not clearly err in concluding that Worley's consent was involuntary when police officers approached Worley in an airport and asked him if they could look in a bag he was transporting, and he responded "You've got the badge, I guess you can." *Id.* at 386. The court concluded that Worley's response was "a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request," rather than a true expression of free and voluntary consent. *Id.*

Here, Ferguson's statements to Thomas did not convey that she was merely acquiescing to authority or agreeing to allow the officers to search out of a sense of futility. Ferguson, by her own admission, agreed when Thomas asked her if the officers could "take a look around." She did not say anything that would indicate that her consent was only given because she felt it futile to resist Thomas's request, or that she was merely acquiescing to his assertion of authority.

conditional guilty plea preserved his right to challenge the denial of his motion to suppress, specifically, Jackson's claim that he did not consent to the police officers' entry into his apartment, and his claim that Ferguson did not consent to the search of the SUV at all. However, the government argues that Jackson did not specifically argue in the district court or preserve in his plea agreement his claim that Ferguson consented to the search of the SUV but limited the scope of her consent to the search of the driver's side visor.

From the record, it is apparent that Jackson did argue before the district court at the evidentiary hearing that Ferguson limited the scope of her consent to Thomas's search of the SUV to the mirror area. Ferguson testified that she told the officers that she would go get Jackson's driver's license from behind the driver's side mirror in the SUV and that when Thomas asked her if he could go get it instead, she agreed. Ferguson's testimony, if believed, would indicate that Ferguson limited the scope of her consent to Thomas's search of the SUV to the vanity mirror on the driver's side. Thus, Jackson adequately presented his theory that Ferguson limited the scope of her consent to the search of the SUV to the district court, and the issue is not waived.

"The district court's determination of whether a search exceeded the scope of consent is a question of fact that we review for clear error." *Canipe*, 569 F.3d at 604 (internal quotation marks omitted). This court defers to the district court's "credibility determinations while construing the evidence in the light most favorable to the winner of the suppression motion—the government in this instance." *Montgomery*, 621 F.3d at 572.

The standard for measuring the scope of a suspect's consent is one of objective reasonableness—in other words, "'what would the typical reasonable person have understood by the exchange between the officer and the suspect?'" *Canipe*, 569 F.3d at 604 (quoting *Florida v.*

14

*Jimeno*, 500 U.S. 248, 251 (1991)). "The scope of a search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251. If an individual's consent "would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." *Id.* at 252.

Thomas and Ferguson recounted very different versions of their conversation in the bedroom. Ferguson conceded that she agreed to let the officers look around her apartment but testified that she never consented to a search of the SUV. Ferguson testified that, at some point, one of the officers asked for identification from her and Jackson, and she then volunteered to go get Jackson's driver's license out of the SUV, where he kept it under the driver's side visor. Ferguson testified that Thomas then asked her if he could go get the license from the SUV instead, and she agreed. By contrast, Thomas testified that when they spoke alone in the bedroom, he explicitly asked Ferguson if he could search *both* her apartment and her vehicle for evidence of narcotics trafficking, and she agreed. Here, the district court credited Thomas's version of events over Ferguson's, noting that after he exited the bedroom, Thomas, in Ferguson's presence, told the other officers that Ferguson had consented to a search of both the apartment and the SUV, and Ferguson did not object. The district court's determination that Thomas was more credible than Ferguson and that his version of their conversation should be credited was not clearly erroneous. Sharp and Schwartz testified consistently with one another, and with Thomas, that Thomas told them in Ferguson's presence that she had consented to a search of her SUV and that Ferguson did not object. If Ferguson had not consented to a search of her SUV when she spoke with Thomas in the bedroom, she likely would have objected when Thomas told Schwartz and Sharp, in front of Ferguson, that she had. Under these circumstances, the district court was entitled to credit Thomas's version of their conversation. Accordingly, the

15

district court's determination that Thomas was more credible than Ferguson and that Ferguson consented to a search of her SUV was not clearly erroneous.

Crediting Thomas's testimony, as the district court reasonably did, the search of the center console did not exceed the scope of Ferguson's consent to search the SUV. Thomas testified that he explicitly told Ferguson that the officers were looking for evidence of narcotics trafficking, and she thereafter consented to a search of the SUV. Because the expressed object of the search was to uncover evidence of narcotics trafficking, the police were entitled to look in any container in the SUV which could have contained such evidence. *See Jimeno*, 500 U.S. at 251–52 (holding that where individual consented to search of a car for narcotics and placed no explicit limitation on the scope of the search, it was objectively reasonable for the police to conclude that the consent included consent to search containers within car that might contain narcotics). Accordingly, we conclude that Thomas did not exceed the scope of Ferguson's consent when he searched the center console of her SUV.

**IV.**

For the reasons stated above, we affirm Jackson's conviction.