NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0434n.06

No. 09-6283

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jun 29, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **WILLIAM EVANS**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| **HARRY CHRISTOPHER VINSON**, Correctional | ) | **O P I N I O N** |
| Officer, Kentucky State Penitentiary, et al., | ) | |
| | ) | |
| *Defendants-Appellees*. | ) | |

BEFORE:    COLE, CLAY, and GILMAN, Circuit Judges.

**COLE, Circuit Judge.**  Only two days after assisting another prisoner in filing a grievance, Plaintiff-Appellant William Evans was placed in administrative segregation for nine days due to a false-positive drug test.  Evans then filed this 42 U.S.C. § 1983 suit against seven prison officials—Defendants-Appellees Harry Christopher Vinson, Nancy Doom, Glenn Haeberlin, Byron Jasis, Joe Keene, Rick Pershing, and Junior Ross—alleging violations of Evans's First, Fourth, Eighth, and Fourteenth Amendment rights.  The district court granted Defendants' motion for summary judgment; Evans appeals.  For the following reasons, we **AFFIRM in part**, **REVERSE in part**, and **REMAND** for further proceedings.

## I. BACKGROUND

### A. Factual Background

The original seven plaintiffs in this case, Alando Sublett, James DeBow, William Evans, Daniel Lindsey, Donnie Ashby, Aaron Burnett, and James Dunn, were all incarcerated at the Kentucky State Penitentiary ("KSP") in May 2005. Evans is the only plaintiff remaining in the suit. The relevant facts, taken in the light most favorable to Evans, are as follows:

On May 17, 2005, Sublett was given a "stick test"—a urine test used in the field to screen for illegal drug use—by Defendant Vinson, a correctional officer at KSP, and another officer. Vinson, displeased with the results, allegedly destroyed Sublett's first sample and ordered another with a different witness. Sublett was then sent to his cell without an opportunity to witness the sealing of the sample or its chain of custody, which is inconsistent with the process usually followed for administering drug tests at KSP. Half an hour later, Sublett was placed in administrative segregation in "3 Cellhouse" as a result of the stick test, which Defendants claimed was positive. Defendants sent an additional sample to Aegis Sciences Corporation ("Aegis") for confirmation.

On May 18, 2005, DeBow, an inmate grievance aide, received a message about the incident and approached Evans, an inmate legal aide, about assisting Sublett in getting released. Evans sent a memorandum to Defendants Pershing, Jasis, and Haeberlin requesting Sublett's release on due process grounds.

On May 19, 2005, Defendants received the lab report from Aegis showing that Sublett had tested negative for drug use, and Sublett was released from segregation. That same day, Vinson administered stick tests to DeBow and Evans, and Defendant Keene, the deputy warden for security

at KSP, served as a witness. Following the tests, DeBow and Evans were ordered to return to their cells. Approximately forty-five minutes later, they were placed in the "'Super Max' Administrative Segregation Unit (7 Cellhouse)" based on allegedly positive stick tests. The May 19, 2005 detention order stated that Evans was "being placed in 7 Cellhouse Admin. Seg. for investigation into Illegal Drug Activity within the institution. This action was taken for the Safety of Staff and inmates, and the safe and secure operation of this institution." (Detention Order, Dist. Ct. Docket No. 71 Ex. 2.) While in 7 Cellhouse, Evans was subjected to a nude strip search, haircut, and shave, and restricted from his job as a legal aide and all of the privileges he enjoyed in the general population and honor housing unit.

Five days later, on May 24, 2005, Defendant Haeberlin, the warden at KSP, advised Evans by letter that the stick tests were under review. On May 26, 2005, the May 19 samples were sent to Aegis for further review, with "Reasonable Cause" listed as the reason for testing. The next day, the lab reports from Aegis were reviewed, and they were negative for drugs. That same day, after nine days of segregation in 7 Cellhouse, Evans and DeBow were released.

Defendants contend that Evans and DeBow were tested pursuant to KSP's random testing policy. A May 4, 2005 memorandum from Defendant Captain Junior Ross, the drug screen coordinator at KSP, provides the following:

> Attached is the random list of Drug Screen Inmates for May, 2005. Please assign trained staff to conduct these tests. We are required to test 10% of the population. This list contains 126 names to allow for transfers and releases and still meet the required 84 tests. You need to have the drug-screens completed no later than the 20th[] of the month. Please forward all Employer copies of the urine samples paperwork to Administrative Supervisor[.] The inmate donor gets the green copy, the front blue copy goes with the specimen, and all other copies come to me . . . .

Note: Starting last month 50% of all drug screens are done by using the (AEGIS) Specimen collection kit and completed by the Lab, the other 50% will be done by using (Redwood Bioteck) test device.

(Memorandum, Dist. Ct. Docket No. 56 Ex. 7.) The "random list," which was generated by a computer in Frankfort, Kentucky and not by anyone at the facility, included Evans and DeBow, but not Sublett.

Evans was tested again on July 4, 2005, fourteen days after filing a grievance. He was also on the random list that month. The lab results from the July test were negative for drugs, but this time the reason listed for testing was "Random." Evans was also tested, with negative results, on September 25, 2005 and March 9, 2008. The lab results from the September test did not include a reason for testing, and those from the March test stated "Random."

## B. Procedural History

Evans and six other pro se prisoners filed suit in the United States District Court for the Western District of Kentucky under 42 U.S.C. § 1983, alleging violations of their state and federal rights. All plaintiffs but Evans have since been dismissed from the action. After the district court's initial review under the Prison Reform Litigation Act, 28 U.S.C. § 1915A, Evans was allowed to proceed on the following claims:

> [His] Fourteenth Amendment due process claim arising out of the positive stick test resulting in his placement in segregation against Defendant KSP Captain Junior Ross in his individual and official capacity;

> [His] Eighth Amendment claim pertaining to his placement in segregation against Defendant KSP Corrections Officers Harry Christopher Vinson and Joe Keene in their individual capacities and against Defendants KSP Procedures Officer Byron Jasis, KSP Deputy Warden of Programs Nancy Doom, KSP Deputy Warden for

Security Rick Pershing, and KSP Warden Glenn Haeberlin in their individual and official capacities;

[His] Eighth and Fourth Amendment claims regarding the reasonableness of the urine tests/selection process against Defendants Vinson and Keene in their individual capacities and against Defendants Pershing, Jasis, and Haeberlin in their individual and official capacities; and

[His] retaliation claims against Defendants Vinson and Keene in their individual capacities and Defendants Pershing, Jasis, and Haeberlin in their individual and official capacities.

(Mem. Op. & Order, Dist. Ct. Docket No. 71, at 1-2.)  After discovery, the district court granted Defendants' motion for summary judgment as to all claims.  Evans filed this appeal.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's grant of summary judgment de novo.  *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006).  A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (internal quotation marks omitted).  In reviewing a summary judgment motion, we view the evidence and reasonable inferences therefrom in the light most favorable to the non-moving party.  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Evans brings his claims under 42 U.S.C. § 1983.  To succeed on a § 1983 claim, Evans must demonstrate that a person acting under color of state law "deprived [him] of rights, privileges or

immunities secured by the Constitution or the laws of the United States." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005).

**B. Monetary Claims Against Defendants in their Official Capacities**

Evans brought suit against Ross in his official capacity only, and against Jasis, Doom, Pershing, and Haeberlin in both their individual and official capacities. To the extent Evans seeks monetary damages from these defendants in their official capacities, his claims are barred by the Eleventh Amendment. *Thiokol Corp. v. Dep't of Treas.*, 987 F.2d 376, 381 (6th Cir. 1993). As a result, we **AFFIRM** the district court's grant of summary judgment on these claims. However, to the extent Evans seeks injunctive relief against these defendants in their official capacities, the suit may proceed. *Cf. Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) ("[O]fficial-capacity actions for prospective relief are not treated as actions against the State.").

**C. Constitutional Claims**

The district court found that summary judgment was appropriate because the evidence taken in the light most favorable to Evans did not establish a constitutional violation on any of Evans's five claims. We consider each of Evans's claims in turn.

*1. Fourteenth Amendment Due Process*

Evans first argues that Defendants' act of placing him in administrative segregation based on the positive result of his stick test deprived him of liberty without due process of law. Defendants respond that placement in administrative segregation does not constitute an actionable deprivation of liberty under the Fourteenth Amendment. Because Evans has not met his burden of establishing

that he had a liberty interest in avoiding temporary placement in administrative segregation, his due process claim fails.

The Due Process Clause of the Fourteenth Amendment "protects persons against deprivations of life, liberty, or property." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). "A liberty interest may arise from the Constitution itself, by reason of the guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Id.* (citation omitted). Because "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system," prisoners have limited liberty interests. *Sandin v. Conner*, 515 U.S. 472, 485 (1995). Although "[t]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," the Supreme Court has held that "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations." *Wilkinson*, 545 U.S. at 221-22.

"[T]he touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson*, 545 U.S. at 222 (quoting *Sandin*, 515 U.S. at 484). When a restraint does not lengthen a sentence, the appropriate inquiry is whether it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

There is no evidence in the record about the conditions Evans faced in administrative segregation. While Evans detailed the conditions of his confinement in his response to the motion for summary judgment, he did not, as the district court acknowledged, "provide these details under

penalty of perjury, in his verified complaint, or in his affidavit attached to his response." (Mem. Op. & Order, Dist. Ct. Docket No. 71, at 4 n.4.)   As a result of Evans's failure to meet his burden of production, we are unable to review whether Evans's transfer to administrative segregation imposed an atypical and significant hardship.  Defendants are thus entitled to judgment as a matter of law, and the district court did not err in granting summary judgment on this claim.

### 2. Eighth Amendment Cruel and Unusual Punishment

Evans's second claim is that Defendants violated the Eighth Amendment when they subjected him to a strip search, haircut, and shave upon his entry into administrative segregation.  The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotation marks omitted).  The district court treated Evans's Eighth Amendment argument as a conditions-of-confinement claim; however, it may also be interpreted as a claim of excessive force.  Under either standard, Evans has failed to assert a violation of his Eighth Amendment rights.

A conditions-of-confinement claim has two elements: a sufficiently serious deprivation and prison officials' deliberate indifference to the prisoner's health or safety. *Spencer v. Bouchard*, 449 F.3d 721, 728 (6th Cir. 2006).  A deprivation is sufficiently serious when it "result[s] in the denial of the minimal civilized measure of life's necessities." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)) (internal quotation mark omitted).  Although the list is not exhaustive, we have found the minimal civilized measure of life's necessities to include food, clothing, shelter, medical treatment, and reasonable safety. *See id.* at 727 (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  The district court found that Evans's complaints of a strip search, haircut, and shave failed

to demonstrate a sufficiently serious deprivation.  We agree.  Evans has not asserted that he was denied any basic human needs while in administrative segregation, and his conditions-of-confinement claim thus fails.

Evans has likewise failed to make out a valid claim of excessive force.  "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) (quoting *Whitley*, 475 U.S. at 327).  Here, the force asserted to search Evans and remove his hair was minor, and not the type to invoke Eighth Amendment protection.  The district court did not err in granting summary judgment to Defendants on this claim.

### 3. Fourth Amendment Reasonableness of the Search

Next, Evans argues that the stick test constituted an unreasonable search in violation of his Fourth Amendment rights.  Although drug tests constitute searches within the ambit of Fourth Amendment protection, *see Pendleton v. Vance*, No. 94-6468, 1995 WL 592048, at *2 (6th Cir. Oct. 5, 1995) (unpublished disposition) (citing *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 617-20 (1989)), drug tests conducted under a prison policy of randomized testing pass Fourth Amendment scrutiny because they are rationally related to legitimate government interests, *see Gibbs v. Johnson*, No. 95-1339, 1995 WL 739470, at *1 (6th Cir. Dec. 12, 1995) (unpublished disposition) (citing *Turner v. Safley*, 482 U.S. 78, 84-91 (1987)); *accord Lucero v. Gunter*, 52 F.3d 874, 877 (10th Cir. 1995).  Non-random searches are constitutional if they are reasonable.  *See Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Evans argues that he was not searched pursuant to the random-testing policy, pointing to the evidence that, although he was on the randomly generated list of inmates who might be subject to a drug test in May, the report from Aegis listed "Reasonable Cause" as the basis for his test. This evidence, along with the evidence referenced in section II.C.5, is sufficient to create a genuine issue of fact concerning whether Evans was tested in accordance with the policy authorizing randomized drug tests. The district court pushed this factual dispute to the side, stating:

> While Plaintiff makes much of the reasons for testing listed on the Aegis lab reports, Plaintiff, nonetheless, concedes that he was on the random computer-generated lists. That KSP officers may have some leeway in choosing 84 inmates from the list of 126 to account for those transferred or released prisoners or that Plaintiff was tested on three occasions in 2005 does not cause the Court to find that the testing process is unreasonable or otherwise allows for repeated harassment by KSP personnel.

(Mem. Op. & Order, Dist. Ct. Docket No. 71, at 14.) The pertinent question, however, is not whether the testing process in general was reasonable, but whether the drug test administered to Evans on May 19, 2005 was reasonable. The district court seems to rely on a theory akin to inevitable discovery—that is, that the drug test would have been administered to Evans because he was on the random list. But testing was not inevitable under the circumstances—only two-thirds of prisoners on the random list are actually tested in a given month. So while it was likely that Evans would have been tested, it was not a foregone conclusion. Moreover, inevitable discovery is a doctrine relating to the exclusionary rule; it does not speak to the legality of the search itself and is thus inapplicable to the § 1983 context. *Cf. Nix v. United States*, 467 U.S. 431, 443-44 (1984). Finally, the Supreme Court has indicated that, although the subjective motivation and reasoning of the officer undertaking the search is not relevant where the search is otherwise supported by probable

cause, the true purpose of the search does matter when the only support for the search is administrative. *See Whren v. United States*, 517 U.S. 806, 811 (1996). For that reason, the random policy can justify the search only if it was actually undertaken pursuant to that policy. Because there is a genuine question of material fact on that issue, and because Defendants have not asserted that the search was reasonable on some other basis, we find that the district court erred in granting summary judgment on Evans's Fourth Amendment claim.

### 4. Eighth Amendment Harassment

Evans also argues that Defendants administered the May 2005 drug test to him solely for harassment purposes, in violation of the Eighth Amendment. Prisoners retain a remedy for "calculated harassment unrelated to prison needs." *Hudson v. Palmer*, 468 U.S. 517, 530 (1984). The district court cited the Seventh Circuit's pronouncement that "the Eighth Amendment's prohibition against cruel and unusual punishment stands as a protection from bodily searches which are maliciously motivated, unrelated to institutional security, and hence 'totally without penological justification.'" *Meriwether v. Faulkner*, 821 F.2d 408, 418 (7th Cir. 1987) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). However, we have neither adopted nor cited our sister circuit's rule, and the Supreme Court has stated that even punishments that are "totally without penological justification" do not violate the Eighth Amendment unless they inflict some level of pain. *Rhodes*, 452 U.S. at 346. Because Evans has failed to make out a cognizable claim, the district court did not err in granting summary judgment to Defendants on this claim.

## 5. First Amendment Retaliation

Finally, Evans claims that he was tested and placed in administrative segregation in retaliation for assisting Sublett in filing a complaint with the prison administration. There are three elements to a retaliation claim:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (plurality opinion). We review each element in turn.

### a. Protected Conduct

The first question is whether Evans engaged in protected conduct. Although there is no constitutional right to assist other prisoners with legal matters, "prisoners are entitled to receive assistance from jailhouse lawyers where no reasonable alternatives are present and to deny this assistance denies the constitutional right of access to the courts." *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Thus, "prison officials may not prevent such assistance or retaliate for providing such assistance where no reasonable alternatives are available." *Id.* Evans has not alleged or presented evidence tending to show that Sublett was unable to file his own complaint or grievance, or that Evans's help was otherwise necessary. However, in *Gibbs*, this Court remanded to allow the plaintiff, who was in a similar situation, to amend his complaint to make such an allegation. 10 F.3d at 379-80. Evans maintains that he is a qualified legal aide who has completed several hours of training, that he is required to help anyone who comes to him for legal assistance,

and that Sublett was in segregation and requested Evans's assistance. Given the liberal pleading standard applied to pro se litigants, *see Thaddeus-X*, 175 F.3d at 395 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), and our precedent in *Gibbs*, and assuming that Evans has established the remaining elements of his claim, we find it equitable to reverse the district court's grant of summary judgment on this claim and remand to allow Evans to amend his complaint and present evidence that Sublett had no reasonable alternative to his assistance.

In addition, we take this opportunity to correct the district court's unduly restrictive statement of the law: "[E]ven if Plaintiff Sublett was somehow prevented from filing a complaint/grievance while segregated, Plaintiff Evans' [sic] fails to show that *his* assistance, as opposed to Grievance Aide DeBow's or another legal aide's assistance, was necessary to vindicate Plaintiff Sublett's right to access the courts." (Mem. Op. & Order, Dist. Ct. Docket No. 71, at 18.) While there must be a showing that the "individual prisoner's right to access the courts has been impaired," *Thaddeus-X*, 175 F.3d at 396 n.11 (citing *Lewis v. Casey*, 518 U.S. 343 (1996)), we have not held, nor can it be true, that the prisoner must need assistance from the particular plaintiff at issue. *Cf. Gibbs*, 10 F.3d at 378-80. If a prisoner needs assistance in filing his legal documents, and any legal aide would be retaliated against for providing assistance and is therefore deterred from doing so, it matters not whether there is one qualified aide or ten; retaliation against the aide who chooses to help still prevents the prisoner from accessing the courts, and the aide thus has a derivative claim for retaliation. *Cf. Thaddeus-X*, 175 F.3d at 395 (stating that "a 'jailhouse lawyer's' right to assist another prisoner is wholly derivative of that prisoner's right of access to the courts"). As a result, on remand Evans may establish protected conduct by proving not that he was the *only* person who

could assist Sublett, but that Sublett needed assistance and had no reasonable alternative but to seek that assistance from another prisoner.

### b. Adverse Action

The second requirement is an adverse action. In the prison context, an adverse action is "an action comparable to transfer to administrative segregation," or an "action[] of lesser severity" that "would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X*, 175 F.3d at 397 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). It is undisputed that Evans was administered a drug test and placed in administrative segregation pending investigation into possible drug activity. Evans contends that Defendants also did not maintain the proper chain of custody for that test. These contentions are supported by evidence in the record and sufficient to deter a person of ordinary firmness from assisting other prisoners in filing legal complaints and grievances.

### c. Causal Connection

The final requirement is a causal connection between the protected conduct and the adverse action. This element comes from the familiar test in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), and is met where the plaintiff establishes that his protected conduct was a "motivating factor" in the adverse action. *Id.* at 287 (internal quotation marks omitted); *see also Thaddeus-X*, 175 F.3d at 399. The burden of production then shifts to the defendant to "show that he would have taken the same action in the absence of the protected activity." *Thaddeus-X*, 175 F.3d at 399. We assume, for the purposes of this analysis, that on remand Evans could show that his assistance of Sublett was protected conduct.

As examined above in section II.C.3, there is a genuine issue of material fact whether the actual reason for Evans's drug test was his presence on the random testing list. From the listing of "reasonable cause" on Evans's testing form, the date of testing only two days after his assistance was rendered and on the day Sublett was released, the delay in sending the results to the lab, his placement in 7 Cellhouse instead of 3 Cellhouse, the fact that others involved in the assistance were also tested and had "reasonable cause" listed as the purpose, and the failure to allow Evans to observe that proper testing procedures were followed and the chain of custody remained intact, a reasonable jury could conclude that Evans's protected conduct was a motivating factor in Defendants' administration of the drug test and extended placement of Evans in administrative segregation. This evidence also rebuts Defendants' claim that they would have taken the adverse action in the absence of the protected conduct, and is sufficient to preclude summary judgment on this claim.

Because Evans has otherwise made out a viable claim of First Amendment retaliation, we reverse the district court's grant of summary judgment and remand to allow Evans to amend the complaint and present evidence that Sublett had no reasonable alternatives to another prisoner's assistance.

### D. Qualified Immunity

Although the evidence viewed in the light most favorable to Evans establishes that Defendants violated Evans's First and Fourth Amendment rights, Defendants may still be entitled to qualified immunity if the constitutional rights at issue were not clearly established at the time of their conduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants asserted the defense of

qualified immunity both below and on appeal; however, they did so in both instances in a one-and-a-half page statement of the law with no attempt at argument, and they cited only the first prong of the test: whether their alleged conduct violated a constitutional right. Defendants have failed to argue that the rights at issue were not clearly established, and as a result they have waived that defense. *See Hills v. Kentucky*, 457 F.3d 583, 588 (6th Cir. 2006) (accepting the district court's conclusion for the first step in the qualified immunity analysis where the defendant made no attempt to explain where the district court erred); *Spirko v. Mitchell*, 368 F.3d 603, 612 (6th Cir. 2004) ("It is a 'settled appellate rule that issues averred to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

### E. Untimely Filing of Defendants' Motion for Summary Judgment

Finally, Evans argues that the district court erred by allowing Defendants to file their motion for summary judgment after the allotted time for filing dispositive motions had lapsed. This contention lacks merit.

The original deadline for dispositive motions was August 13, 2008. On that day, Defendants moved for an extension, which the district court granted. The new deadline was September 12, 2008. On September 19, 2008, Defendants moved for leave to file their motion for summary judgment out of time within the next fifteen days, stating as the reason for the delay that the district court had not ruled on a motion for removal of one of the plaintiffs in the action until September 18, 2008. The district court granted that motion on March 27, 2009, finding that "Defendants ha[d] shown good cause for filing their motion for summary judgment within 20 days after its original due

date and Plaintiff ha[d] shown no prejudice by this minor delay." (Order, Dist. Ct. Docket No. 64, at 1.)

"When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed R. Civ. P. 6(b)(1). We review the district court's determination of excusable neglect for abuse of discretion. *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006). In granting Defendants' motion, the district court cited the short length of the delay, the lack of prejudice to Evans, and that the delay was for good cause—all appropriate considerations weighing in favor of finding excusable neglect, *see id.* (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). Evans has not explained how the district court abused its discretion in granting Defendants' motion for leave to file out of time. His contention that summary judgment should be denied based on Defendants' failure to comply with the briefing schedule thus fails.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** district court's grant of summary judgment as to Evans's First Amendment retaliation and Fourth Amendment unreasonable-search claims against Defendants in their individual capacities—and their official capacities to the extent injunctive relief is sought— **AFFIRM** the district court's judgment in all other respects, and **REMAND** the case for further proceedings consistent with this opinion.