NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0192n.06
Case No. 19-1367

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 03, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| LANTREL DEKEITH WILSON, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

_____/

Before: MERRITT, MOORE, and MURPHY, Circuit Judges.

**MERRITT, Circuit Judge.** Defendant Lantrel Wilson appeals the district court's denial of his motion to suppress evidence discovered during a pat-down search conducted after defendant was found sleeping in a car. The officers contend that they sought and received consent from defendant to pat him down for weapons, and discovered that defendant had a firearm in his waistband. Defendant contends that he did not consent. After a hearing regarding the motion to suppress, the district court found that defendant voluntarily consented to the search. The district court also found, in the alternative, that the officers had reasonable suspicion to justify the pat down of defendant for weapons and that the officers would have inevitably discovered the firearm because they had probable cause to arrest him for several other offenses. Because the district court did not clearly err in concluding that defendant voluntarily consented to the pat-down search, we

affirm its judgment. We also agree with the district court that the officers were entitled to search defendant, even without his consent, given the circumstances.

## I.

In June 2018, someone called 911 just before 5 am to report a person "passed out" in a vehicle in Lansing, Michigan. Lansing police officers Ricky Spratt, Robert Bricker, and Stacey Browe responded. Dispatch informed them that the car belonged to a woman who did not live in the immediate area. The vehicle was at the end of an unlit dead-end street known to the officers to be a high-crime area. When the officers, who were wearing body cameras,[1] arrived, they saw an "unresponsive" man sitting upright in the driver's seat of the vehicle. Motion to Suppress Hr'g Tr. at 7. Loud music was playing from the radio. The volume of the music made it impossible for Officer Spratt to tell if the engine was running, but he noticed as he approached that the keys were in the ignition and turned forward.

The officers were concerned that the man, who was later identified to be defendant, was having a medical emergency, and they tried to rouse him by shining their flashlights on his face, but got no response. Officer Spratt then opened the unlocked passenger-side door and saw an open bottle of what he believed to be alcohol in the center console. Officer Bricker opened the driver-side door. Officer Spratt removed the keys from the ignition to stop the music, and he shook defendant on the right arm and kept talking to him until he was responsive. Each time Officer Spratt moved defendant's right arm, his hand went to his waistband. Fearing that the man might have a weapon, Officer Spratt ordered him to keep his hands up. The officers wanted to summon an ambulance because they continued to fear that the man might have overdosed or be experiencing

---

[1] A CD of the 911 call and the body camera video is part of the record in this case.

some other medical problem, but defendant declined. Officer Spratt testified that he believed the man to be intoxicated. Hr'g Tr. at 27.

Officer Spratt asked defendant to step out of the car. The officer testified that defendant "stumbled a bit" and seemed "puzzled" and swayed back and forth. Hr'g Tr. at 17, 25. He told the officers that his name was "Duke Wilson" and he was visiting a friend in the area. Officer Spratt asked him if he could pat him down "so we can make sure our safety is fine." Hr'g Tr. at 32. Defendant nodded and complied with the officer's request to put his hands behind his back. Officer Spratt patted the man down and felt a pistol handle in his front right waistband. Office Spratt removed the gun and handcuffed the man. Once arrested, a preliminary breath test for alcohol determined his alcohol count was more than double the legal limit. It was later discovered that defendant had three baggies of cocaine in his pocket, and he was on federal supervised release for earlier crimes.

Defendant was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), and possession of a controlled substance in violation of 21 U.S.C. § 844. After his motion to suppress the weapon and drugs was denied, defendant pled guilty to being a felon in possession of a firearm pursuant to a conditional plea agreement that reserved his right to appeal the suppression ruling. He was sentenced to 50 months imprisonment. This timely appeal followed.

**II.**

The sole issue on appeal is whether the district court erred in denying defendant's motion to suppress evidence. Defendant challenges the three grounds for denying the motion that the district court gave in its ruling. On appeal from a motion to suppress, we review factual findings

for clear error and legal conclusions *de novo*.  *United States v. Perez*, 440 F.3d 363, 365-66 (6th Cir. 2006).

### A. <u>Consent</u>

Defendant's primary argument on appeal is that he did not consent to the search of his person.  While the Fourth Amendment protects citizens against unreasonable searches and seizures, a search of a person is not unreasonable if that person gives free and voluntary consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Kelly*, 913 F.2d 261, 265 (6th Cir. 1990).  The government bears the burden of proving, through "clear and positive testimony" that the consent to search was given voluntarily. *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998).  "Consent is voluntary when it is unequivocal, specific and intelligently given, uncontaminated by any duress or coercion."  *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (internal citations omitted).  Voluntariness is determined by examining the totality of the circumstances.  *See Bustamonte*, 412 U.S. at 227; *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir. 1977).  A court should consider the use of coercive or punishing conduct by the police; and indications of "more subtle forms of coercion that might flaw [an individual's] judgment." *United States v. Watson*, 423 U.S. 411, 424 (1976).

In conducting an inquiry into consent to search, the court should examine the following nonexclusive factors: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (quoting *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996)).

In this case, Officer Spratt asked defendant, "I just want to make sure you don't got no weapons or nothing. Can you do me a favor? Can you put your hands behind your back so we can make sure our safety is fine." Hr'g Tr. at 32. Defendant appeared to consent by first nodding his head, and then following the officer's request to put his hands behind his back. Despite this appearance of acquiescence, defendant argues that any consent was not voluntary due to the coercive nature of the encounter. We note that lack of voluntariness was not raised in defendant's motion to suppress, but it was argued briefly at his hearing and the district court addressed it in its ruling.

Whether a person is in custody is not dispositive of whether consent can be freely given. *Salvo*, 133 F.3d at 953-54. While it is debatable whether defendant would feel free to go in these circumstances, that is but one factor to consider in determining consent. Coercive behavior includes "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . ., or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Peters*, 194 F.3d 692, 697 (6th Cir. 1999) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Defendant argues that there were two officers, they had shaken him awake, they had bright lights shining on the car, and they ordered him out of the vehicle. He contends that under these circumstances, the nod of his head and the agreement to put his hands behind his back as the officer requested were coerced, not voluntary, actions. In contrast, the government points out that he was not handcuffed and the officers did not have their weapons drawn. They touched defendant while he was in the car only to try to rouse him, not to detain him. They were not yelling at him. The request was made by Officer Spratt in a polite tone in the nature of a request, not a command. Hr'g Tr. at 67-69.

The district court properly considered the totality of the circumstances in concluding that defendant freely gave consent to the pat-down search for weapons. The court noted that, as seen in the video, defendant "perceptively nodd[ed]" his head and then put his hands behind his back at Officer's Pratt's request. Hr'g Tr. at 72. The district court also concluded the officers' actions and tone of voice indicate that the officers did not engage in any coercive behavior towards defendant that would vitiate consent. *Id*. at 72-73. The district court did not clearly err in concluding that the government met its burden in demonstrating that defendant "voluntarily and knowingly" consented to the pat-down search.

## B. <u>Inevitable Discovery Doctrine</u>

The district court ruled, in the alternative, even if defendant did not give consent to search his person, the weapon would have inevitably been discovered. Hr'g Tr. at 73. Under the inevitable discovery doctrine, evidence obtained unlawfully will not be suppressed if the government can prove that the evidence inevitably would have been obtained through lawful means. *Nix v. Williams*, 467 U.S. 431, 448 (1984). For the doctrine to apply, the government must demonstrate "the existence of an independent untainted investigation that inevitably would have uncovered the same evidence," or "other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499-500 (6th Cir. 1995).

The hearing transcript demonstrates that the officers had probable cause to arrest defendant for (1) operating a vehicle while under the influence of alcohol in violation of Mich. Comp. Laws § 257.625(1); (2) possessing an open container of alcohol in his car, in violation of Mich. Comp. Laws § 257.624a and of the terms of his supervised release; and (3) violating the municipal noise ordinance. As defendant points out, the officers did not in fact arrest defendant on any of these

charges. But Officer Spratt testified that he would have placed defendant under arrest for the violations had the gun not been found, noting particularly that driving under the influence and violating the terms of supervised release are serious crimes that would have prevented the officers from releasing defendant. Hr'g Tr. at 21-23.

The officers detailed the circumstantial evidence that led them to conclude that they had probable cause to believe that defendant had driven while intoxicated. When the officers arrived on the scene, they found defendant unresponsive in his car with what appeared to be an open container of alcohol in the console beside him. They had difficulty rousing him, and they smelled alcohol in the car and saw the open container next to defendant.[2] While defendant is correct that the officers did not see him driving the car, it was reasonable for them to believe that he had done so as he was sitting in the driver's seat with the keys in the ignition, and with the radio on. He had some difficulty standing up after he got out of the car. The officers would have had probable cause to arrest him under the circumstances. Based on this fact, Officer Spratt testified at the hearing that he would have arrested defendant.

###### C. <u>Reasonable Suspicion to Pat Down</u>

The district court also concluded that even if defendant did not give consent, the pat down was necessary for the officers' safety. Hr'g Tr. at 74. "A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver . . . out of a car during a traffic stop, . . . and conducting pat-down searches 'upon reasonable suspicion that they may be armed and dangerous.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005) (citations omitted) (quoting *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)). An officer may pat down a person in the course of a *Terry* stop if he can "point to particular facts from which he reasonably

---

[2] When tested, defendant's blood alcohol content was .193, well above the legal limit for operating a vehicle.

inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 U.S. 40, 64 (1968). Officer Spratt testified that defendant's hand went to his waistband at least twice while defendant was still in the car, and, in his experience, the waistband was a common place to keep a weapon. This movement led the officer to suspect that defendant might have a weapon. *See United States v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014) (Officers may "perform a 'pat-down' of a driver . . . upon reasonable suspicion that they may be armed and dangerous." (citation omitted)). Furthermore, the car was not registered to defendant and the owner of the car did not live in the area. The circumstances under which the officers found defendant reasonably led them to believe he might be armed.

The judgment of the district court is affirmed.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** The majority's opinion reduces to three propositions. First, if a police officer finds you sleeping or unconscious in a car with your hands resting on your lap, roughly shakes your arm to wake you, and you return the arm to its original resting position on your lap, that officer has reasonable suspicion that you are armed and dangerous, and may order you out of the car to search you. Second, if the officer—after physically rousing you—asks you to step out of your vehicle and to put your hands behind your back while immediately taking hold of your arm, a wordless nod on your part constitutes unequivocal consent to the officer's ensuing search of your body. Third, even if this search violated your constitutional rights, the courts will ignore this violation if the officer had probable cause to arrest you for any other offense—even one for which, in reality, he may not have arrested you. I find each of these propositions to be at odds with the Fourth Amendment, and therefore I dissent.

## I. REASONABLE SUSPICION

First, the majority omits crucial portions of the arresting officers' testimony and fails to discuss the revealing bodycamera footage in concluding that the officers had reasonable suspicion to search Lantrel Wilson because he was armed and dangerous. "Reasonable suspicion is based on the totality of the circumstances," *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th Cir. 2003), and "requires more than just a 'mere hunch,'" *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)), but less than proof by a preponderance of the evidence, *see United States v. Sokolow*, 490 U.S. 1, 7 (1989). As an initial matter, the majority notes that "the car was not registered to defendant and the owner of the car did not live in the area," Maj. Op. at 8, but not even the government argued in this case that this fact gave the officers reasonable suspicion that Wilson was armed and dangerous.

More significantly, the majority's terse description of Wilson's physical response to the officers' actions ignores what the bodycamera footage plainly reveals and what Officer Spratt admitted on the stand. The footage shows that when the officers first opened the doors of the vehicle and found Wilson sleeping or unconscious, Wilson's hands were resting on his lap, Spratt Video at 1:00, and that after Spratt shook Wilson's right arm, Wilson simply returned the arm to its initial, resting position, *id.* at 1:33, 1:40, 2:08. Spratt even acknowledged at the suppression hearing that after he finished "shaking [Wilson] pretty vigorously," Wilson was "bringing [his arm] back to rest on his exactly where he was sitting when [Spratt] found him." R. 27 (Suppression Hr'g Tr. at 31) (Page ID #94). Wilson's arm did not suspiciously relocate to his waistband after initially resting on a different part of his body; his hands had been resting on his lap in a natural, seated position before Spratt ever touched him.

Wilson's physical readjustment was nothing like the evasive or sudden movements that we have held trigger reasonable suspicion. *See, e.g.*, *United States v. Smith*, 594 F.3d 530, 542 (6th Cir. 2010) (defendant's "sudden reach into his jacket" supported the officers' reasonable suspicion that he was armed and dangerous); *United States v. McDaniel*, 371 F. App'x 617, 621 (6th Cir. 2010) (officers had reasonable suspicion to search a vehicle passenger when he "appeared startled and turned his body away from them," and "ma[de] a furtive movement as if he was putting something into his waistband"). Wilson did not reach over to the passenger seat, *see United States v. Tillman*, 543 F. App'x 557, 562 (6th Cir. 2013), or toward the center console, *see United States v. Ledbetter*, 929 F.3d 338, 347 (6th Cir. 2019), or under his seat, *see United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007), nor did he "quickly reach[] into his . . . pocket," *United States v. Martin*, 473 F. App'x 494, 495 (6th Cir. 2012). He moved his arm back to the position it was in before the officers began physically to rouse him. Even Spratt's fellow officer testified that

none of the movements Wilson made in the vehicle gave him concern that Wilson was armed and dangerous. R. 27 (Suppression Hr'g Tr. at 50) (Page ID #113). For these reasons, I cannot agree that there was reasonable suspicion to search Wilson.

## II. CONSENT

Next, the majority wrongly concludes that the district court did not clearly err on the consent issue. "Consent to a search, in order to be voluntary, must be unequivocal, specific and intelligently given, uncontaminated by any duress or coercion, and is not lightly to be inferred." *Simmons v. Bomar*, 349 F.2d 365, 366 (6th Cir. 1965) (per curiam). The government's burden to show that a defendant consented voluntarily "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968).

The majority first offers factual misstatements to support its conclusion, recounting the moment of supposed consent as follows: "Officer Spratt asked [Wilson] if he could pat him down 'so we can make sure our safety is fine.' Defendant nodded and complied with the officer's request to put his hands behind his back." Maj. Op. at 3. Video evidence directly contradicts this recitation of the facts in two critical ways. First, Wilson's "nod" was not in response to the "request" for him to put his hands behind his back. Spratt's bodycamera footage reveals that Spratt stated: "Hey Duke, do me a favor. I just want to make sure you don't have no weapons or nothing, okay?" Spratt Video at 3:46–3:48. At this moment—before the request—Wilson nodded. *Id.* Spratt then continued: "So we can make sure our safety is fine, can you put your hands behind your back? It's just our policy." *Id.* at 3:49–3:52. The footage clearly shows that Wilson did not "nod" yes in response to Officer Spratt asking him to put his hands behind his back. Second, Officer Bricker's bodycamera footage unmistakably reveals that Wilson did *not* move his hands behind

his back voluntarily. At the same moment that Officer Spratt says to Wilson, "[C]an you put your hands behind your back?" Spratt grabs Wilson's left wrist and moves it behind his back, before Wilson has an opportunity to act. Bricker Video at 4:18. Any suggestion that Wilson voluntarily moved his hands behind his back, signaling his consent, is thus "utterly discredited by the record," and this court should not "rel[y] on such visible fiction." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

As for its legal analysis, the majority overlooks several parts of this incident that indicate Wilson's lack of consent. First, by the time Spratt asked Wilson if he could conduct the search, Spratt and his fellow officer had already physically roused Wilson from slumber while he was alone in the vehicle. "A scared, defenseless man is not in a position to say no to a police officer whose hands are still on or just removed from his body while another officer is standing just a few feet away." *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011); *see also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (identifying "some physical touching of the person of the citizen" as evidence that an encounter was a nonconsensual seizure). This physical contact, moreover, was not de minimis; Spratt acknowledged that he was "shaking [Wilson] pretty vigorously" in the vehicle. R. 27 (Suppression Hr'g Tr. at 31) (Page ID #94).

Second, Wilson's ability to exit the scene was severely restricted.[1] On the related question of whether a defendant bus passenger was "seized" for Fourth Amendment purposes during questioning by a law-enforcement officer, the Supreme Court emphasized the passenger's physical freedom of egress throughout the encounter. *See United States v. Drayton*, 536 U.S. 194, 204 (2002) ("[The officer] left the aisle free so that respondents could exit."); *id.* ("There was . . . no

---

[1] Notably, the government does not attempt to dispute Wilson's argument that he was in custody when he was asked to consent, *see* Appellant Br. at 17; instead it dismisses the import of this argument by stating that "[w]hether a person is in custody is only one factor in considering whether he or she voluntarily consented to a search," Appellee Br. at 15 (citing *United States v. Faulkner*, 133 F. App'x 298, 303 (6th Cir. 2005)).

blocking of exits."); *id.* at 205 (another officer positioned at the front of the bus "said nothing to suggest that people could not exit and indeed he left the aisle clear"). Here, by contrast, by the time Wilson awoke, the officers had (1) opened the doors to the vehicle, (2) removed his keys from the ignition, preventing his exit by car, and (3) positioned themselves at the driver- and passenger-side doors, preventing his exit by foot. *See United States v. Jones*, 846 F.2d 358, 361 (6th Cir. 1988) (per curiam) ("[T]he initial stop and blocking of Jones's car by three police cars established a custodial atmosphere and coercive environment."). Furthermore, after Wilson exited the vehicle, Spratt communicated to him—both verbally and physically—that he could not leave the scene. After Officer Browe asked Wilson which apartment his cousin was in, Wilson attempted to walk past Spratt to identify the apartment, stating, "The first one, I'll show you." Bricker Video 4:03. In response, Spratt stepped in Wilson's path, held out his hand, and stated, "Nah, nah, it's fine, she's just gotta check it out." *Id.* at 4:04–05.

Third, immediately prior to the search, Spratt had asked Wilson to step out of the car. It is clear from the bodycamera footage that this first "ask" of Wilson—for him to step out of the car—was more of a direction than a request. *See United States v. Cowan*, 704 F. App'x 519, 526 (6th Cir. 2017) (Moore, J., dissenting) ("[The police officer]'s 'ask' was only *that* [the defendant] move to the side, and not *whether* [the defendant] would consent to a pat-down of his person."). Fourth, Wilson did not "assist the officers in their search," he did not "make any additional statements which would indicate free and voluntary consent," and the officers did not inform him of his right to refuse consent. *United States v. Worley*, 193 F.3d 380, 386–87 (6th Cir. 1999). "[A]lthough law enforcement officials are not required to inform criminal suspects of their right to refuse consent to a search, 'knowledge of the right to refuse consent is one factor to be taken into account.'" *Id.* at 386–87 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

The majority cites no caselaw in support of its conclusion that the district court did not clearly err on the consent issue. Instead, it responds to the overwhelming evidence that Wilson did not consent by offering two mistaken factual observations that are directly contradicted by the bodycamera footage.[2] For the reasons stated above, I believe the majority is wrong.

## III. INEVITABLE DISCOVERY

The majority's final error is its conclusion that that Wilson's firearm would have inevitably been discovered by lawful means. When determining if evidence would have been inevitably discovered, we focus on "affairs as they existed at the instant before the unlawful search." *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995) (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)). "[We] must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment." *United States v. Lazar*, 604 F.3d 230, 240 (6th Cir. 2010) (quoting *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999)).

The question under the inevitable-discovery doctrine is not simply whether law-enforcement officials had probable cause to arrest the defendant, which would have permitted them to conduct a search. Rather, we must inquire whether a lawful arrest—and thus the discovery of the evidence pursuant to a lawful search—was "inevitable." In other words, we must conclude that the arrest *would* have happened, not just that it *could* have happened. *See Nix v. Williams*,

---

[2] Even if I agreed that Wilson did not merely acquiesce to Spratt's claim of lawful authority, I would still conclude that Wilson did not consent to the search given his state of inebriation. We have ruled that "medication or intoxication may diminish the capacity to consent to the extent it undermines an individual's grasp on the reality of what he is doing." *United States v. Montgomery*, 621 F.3d 568, 572 (6th Cir. 2010). This approach "gauge[s] the impact of drugs [or alcohol] on a case-by-case basis and in view of other circumstances at play." *Id.* In this case, the officers' own retelling of the events of June 24 depicts Wilson in a state of severe intoxication even after he became responsive—"slurr[ing]" his speech, R. 27 (Suppression Hr'g Tr. at 47) (Page ID #110), "stumbl[ing] a bit" and "look[ing] a bit puzzled," *id.* at 16–17, and "swaying back and forth," *id.* at 25. This is the exact opposite of *Montgomery*, in which we explained that we had previously upheld a search based on the testimony of two police officers who said that the defendant "did not seem impaired, was not swaying or unsteady, had no trouble signing the consent form, and appeared to be coherent." 621 F.3d at 572 (quoting *United States v. Fletcher*, 295 F. App'x 749, 757 (6th Cir. 2008)). Here, by contrast, Wilson's intoxicated state prevented him from providing "unequivocal, specific and intelligently given" consent. *Simmons*, 349 F.2d at 366.

467 U.S. 431, 444–45 n.5 (1984) ("[I]nevitable discovery involves no speculative elements."). For example, in *United States v. Garcia*, 496 F.3d 495 (6th Cir. 2007), we applied the inevitable-discovery doctrine to the unconstitutional seizure of the defendant's pager, when the police were already engaged in a lawful investigation of the defendant and his confederates for drug trafficking. *Id.* at 506. Shortly after the police seized the defendant's pager, the investigation independently unearthed two bundles of cash belonging to the defendant, giving the officers probable cause to arrest him. The discovery of the pager was inevitable not because the officers would have ultimately had probable cause to arrest the defendant for another offense, but because the arrest for the bundles of cash would have inevitably occurred in light of the officers' existing, independent, untainted investigation. *See also Kennedy*, 61 F.3d at 501 (inevitable-discovery doctrine applied to unlawful search of defendant's luggage when officers were already suspicious that it contained drugs or explosives, and defendant's other piece of opened luggage had contained $176,000 in cash); *United States v. Hodge*, 714 F.3d 380, 388 (6th Cir. 2013) (exhaustive search of house for drugs would have inevitably led law enforcement to discover a pipe bomb); *United States v. Mohammed*, 512 F. App'x 583, 589 (6th Cir. 2013) ("routine" check of the defendant's firearm would inevitably have revealed that it was stolen).

The same cannot be said in this case, despite the fact that the officers almost certainly had probable cause to arrest Wilson for violations of alcohol-related offenses and would have eventually had probable cause to detain him for violating a condition of supervised release. Several factors caution against concluding that the inevitable-discovery doctrine applies here. First, unlike in the cases cited above, in which law-enforcement officers were carrying out an ongoing criminal investigation regarding a suspect, here the officers encountered Wilson for the purpose of performing a "welfare check" and found him sleeping or passed out in a car. Indeed, Spratt

confirmed that he did not respond to the 911 call to investigate a crime. R. 27 (Suppression Hr'g Tr. at 26) (Page ID #90).

Second, there is uncertainty as to whether an arrest would routinely occur in this context. Spratt did not testify or otherwise demonstrate that it was routine—let alone inevitable—for the police to make arrests of intoxicated individuals sleeping or passed out in vehicles, when no investigation into an alcohol-related offense was ongoing. Indeed, when Spratt's fellow officer Bricker was asked at the suppression hearing, "Were you investigating an open intox at any point?" he said no. *Id.* at 51. Third, contrary to Spratt's testimony that he would have executed an arrest, much of the contemporaneous evidence indicates the opposite. Spratt had called for an ambulance, *id.* at 15, and asked Wilson to step out of the vehicle out of concern for officer safety, not to investigate an offense, *id.* at 16. Most significantly, Officers Spratt and Bricker repeatedly told Wilson that he was "not in trouble" or "under arrest or anything like that." Spratt Video at 2:47, 3:55. It is far from clear that an arrest was "inevitable" when the officers themselves assured Wilson that he was neither in trouble nor under arrest.[3]

Whereas "inevitable discovery involves no speculative elements," *Nix*, 467 U.S. at 444–45 n.5, the majority engages in considerable speculation to determine that—if the unlawful search

---

[3]Expanding the inevitability inquiry beyond the question of whether the officers had probable cause to arrest for another offense does not conflict with *Whren v. United States*, 517 U.S. 806 (1996). In *Whren*, the Supreme Court declined the petitioners' invitation to inquire into law-enforcement officers' subjective intentions in initiating a traffic stop, holding that "*whatever* the subjective intent," the existence of probable cause justifies a search and seizure. *Id.* at 814. The inevitable-discovery doctrine, by contrast, does not deal with whether a given search or seizure was justified—it asks whether, despite the unlawfulness of a particular search or seizure, the evidence in question would have been lawfully discovered anyways. As we have explained, "inevitable discovery is a doctrine relating to the exclusionary rule; it does not speak to the legality of the search itself." *Evans v. Vinson*, 427 F. App'x 437, 444 (6th Cir. 2011). This is not a case in which, for example, the patdown itself was supported by probable cause despite some evidence of illicit motive by the arresting officers. Moreover, in *Whren*, the petitioners asked the Supreme Court to consider "whether the officer's conduct deviated materially from usual police practices, so that a reasonable officer in the same circumstances would not have made the stop *for the reasons given*," *Whren*, 517 U.S. at 814 (emphasis added), and the Court explained that "this approach is plainly and indisputably driven by subjective considerations," *id.* The proper approach to the inevitable-discovery doctrine is different. It does not ask whether an arrest would have occurred "for the reasons given," or whether a subsequent arrest would have been executed only with an illicit motive, but simply whether such arrest was objectively likely to occur.

had not occurred—the officers would have inevitably used their discretion to arrest Wilson. *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019) (recognizing the existence of "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so"). Would the officers have allowed an ambulance to escort Wilson away from the scene, rather than placing him under arrest? Was it routine for police officers encountering intoxicated individuals sleeping in cars to arrest them for alcohol-related offenses, rather than ticketing them? Do police officers routinely detain individuals on supervised release for possession of alcohol? Would the officers have proceeded to execute an arrest when they assured Wilson that he was "not under arrest or anything like that"? Bricker Video at 4:21. The majority offers no answers to these questions, only reliance on Officer Spratt's testimony that he would have arrested Wilson. In my view, the Fourth Amendment demands an inquiry much more robust than this.

For the foregoing reasons, I dissent.